FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Jul 18 2024

KEVIN P. WEIMER , Clerk

By: /s/ Alice Ward
Deputy Clerk

# United States District Court

NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

v.

FRANCISCO IVAN CORTEZ-CAMARGO;
YEIMY CHAVEZ; EDGAR RAMIREZ;
RICHARD DARITY; LUIS MIGUEL MONTOYA
VILLAGOMEZ; AND, QUINCY WILLIAMS

**CRIMINAL COMPLAINT**

Case Number:  1:24-mj-618

I, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief.  Beginning on a date unknown but by on or about July 4, 2024 in Fulton County, in the Northern District of Georgia, defendant(s) did, did knowingly and willfully combine, conspire, confederate, agree and have a tacit understanding with each other, and with others known and unknown, to violate Title 21, United States Code, Section 841(a)(1), that is to knowingly and intentionally possess with intent to distribute a controlled substance

in violation of Title 21, United States Code, Section(s) 846.

I further state that I am a(n) Task Force Officer and that this complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT


Continued on the attached sheet and made a part hereof.   Yes


*Cory B. Walker*
Signature of Complainant
Cory B. Walker

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to me by telephone pursuant to Federal Rule of Criminal Procedure 4.1.

July 18, 2024                                                         at    Atlanta, Georgia
Date                                                                              City and State


REGINA D. CANNON
UNITED STATES MAGISTRATE JUDGE                          *R. Cannon*
Name and Title of Judicial Officer                                  Signature of Judicial Officer
AUSA Richard C. Beaulieu /
Richard.Beaulieu@usdoj.gov

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Cory B. Walker, a Task Force Officer with the Drug Enforcement Administration ("DEA"), Atlanta, Georgia, being duly sworn, hereby state that the following is true and correct to the best of my knowledge and belief:

## INTRODUCTION

1. I make this affidavit in support of an application for a Criminal Complaint against the following defendants:

    a. Francisco Ivan CORTEZ-Camargo;

    b. Yeimy CHAVEZ;

    c. Edgar RAMIREZ;

    d. Richard DARITY;

    e. Luis Miguel MONTOYA Villagomez; and,

    f. Quincy WILLIAMS.

2. Based on the following facts, I submit that there is probable cause to believe that beginning on an unknown date but at least as of July 4, 2024, in the Northern District of Georgia and elsewhere, the defendants did knowingly and willfully combine, conspire, confederate, agree and have a tacit understanding with each other, and with others known and unknown, to violate Title 21, United States Code, Section 841(a)(1), that is to knowingly and intentionally possess with intent to distribute a controlled substance, all in violation of Title 21, United States Code, Section 846.

3. The facts set forth in this affidavit are known to me as a result of my personal

1

participation in this investigation, statements of witnesses, and information supplied to me by other law enforcement officers. In this affidavit, I have set forth only the facts I believe necessary to establish probable cause for the Criminal Complaint. This affidavit does not contain every material fact I have learned during the course of this investigation.

## AFFIANT BACKGROUND

4. I am an Investigator with the Cartersville Police Department's Criminal Investigations Division currently assigned as a Task Force Officer with DEA Atlanta. I have been employed as a law enforcement officer since December 2020. I am a certified peace officer by the state of Georgia Peace Officer Standards and Training Council. I have been assigned to the Criminal Investigations Division since January of 2023 and have approximately 18 months of criminal investigations experience. I also have experience investigating other violations of Georgia state law during my assignment to the Uniform Patrol Division with the Cartersville Police Department. I have received certifications in Basic Law Enforcement Training in 2021 and Field Training Officer in 2022. I have received over 900 hours of training and specialized training in Interviews and Interrogations, Search Warrants and Affidavits, as well as extensive tactical training. I have participated in numerous investigations including theft, fraud, forgery, drug, assault, battery, sexual offenses, and death investigations during his time in the Criminal Investigations Division and during my time in the Uniform Patrol Division. My experience comes from my own investigations as well as my participation in other investigations conducted by other law enforcement officers.

**SOURCES OF INFORMATION**

5. The information set forth in this affidavit is based on my personal observations and knowledge, and may also be based on: (a) my training and experience, (b) information obtained from other individuals participating in the investigation, (c) reports and/or business records, (d) recorded conversations, (e) physical and electronic surveillance, and (f) communications with other individuals who have personal knowledge of the events and circumstances described herein, as well as (g) court authorized [intercepted] wire and electronic communications. Since this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included in this affidavit every detail of the investigation. Rather, I have set forth facts that I believe are sufficient to establish probable cause for the issuance of the requested search warrants. Unless specifically indicated otherwise, any conversations and statements described in this affidavit are related in substance and in part only.

6. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Such statements are stated in substance, unless otherwise indicated. Wherever in this affidavit I state a belief, that belief is based upon my knowledge, training, experience, discussions with senior agents, and the information obtained through this investigation.

7. The intercepted communications referenced below have been translated and/or transcribed by DEA personnel monitoring the wiretap, and include quotes from the

intercepted conversations, which I denoted in the summaries with quotation marks. I have been advised by other law enforcement officers and/or monitors, who have listened to or reviewed the recording of the communications. These summaries, translations, and transcriptions are drafts and are subject to revision. Moreover, the participants in the criminal conspiracy often speak in code, which is subject to interpretation. Consequently, I have provided my interpretation of the meaning and context of the conversations; it is not intended as a verbatim description of any particular statement. I based my interpretations on the investigation to date, as well as on my training and experience as a DEA Task Force Officer. The descriptions of the phone conversations in this affidavit are summaries and excerpts and do not represent the entirety of the conversations.

8. Unless specifically indicated otherwise, any conversations and statements described in this affidavit are related in substance and in part only.

## PROBABLE CAUSE BASIS

9. Since May 2023, DEA Atlanta, Enforcement Group One, has been investigating the drug trafficking organization (DTO) and money laundering organization (MLO) of CORTEZ (CORTEZ DTO) in the Northern Direct of Georgia and elsewhere. Through the investigation, agents have identified several cellular telephone numbers associated to CORTEZ. Evidence gathered throughout this investigation shows CORTEZ is distributing illegal narcotics and laundering narcotics proceeds in the Northern District of Georgia, and elsewhere.

10. On May 9, 2024, United States District Judge Victoria M. Calvert signed a court

order under Title III of The Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510 et seq.) authorizing agents to intercept wire communications for (678) 588-0131 (TT1) and both wire and electronic communications on (470) 549-6874 (TT2), both utilized by CORTEZ.

11. Throughout the aforementioned intercept period, agents have identified MONTOYA as the second-in-command and a high-ranking member of the CORTEZ DTO responsible for the coordination of suspected narcotics shipments from Houston, Texas, destined for Atlanta, Georgia and elsewhere; the distribution of suspected narcotics to customers; and the collection of narcotics proceeds which are returned back to the CORTEZ DTO. Additionally, agents have identified DARITY as a narcotics distributor who receives narcotics from the CORTEZ DTO.

12. On July 3, 2024, United States District Judge Steve C. Jones signed a court order under Title III of The Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510 et seq.) authorizing agents to intercept wire and electronic communications for (678) 588-0131 (TT1) and (470) 669-0571 (TT2), both utilized by CORTEZ, wire communications for (470) 597-3503 (TT3), utilized by MONTOYA, and wire and electronic communications for (470) 230-1260 (TT4), utilized by Melvin HARRELL. Interception ceased on July 17, 2024.

### A. July 8, 2024 Narcotics Transaction

13. On July 4, 2024, at approximately 7:59 A.M., the following wire communication was intercepted between CORTEZ, utilizing TT-2, and WILLIAMS, utilizing 404-771-

5

1595, regarding the purchase of cocaine and methamphetamine from the CORTEZ DTO.

 a. CORTEZ: Yeah, bro? Hey, bro!

 b. WILLIAMS: Man, come on, man. For real, man, why I gotta ask you now?

 c. CORTEZ: I got you, bro, for real, for real, no cap. On the "shoes", I got you for sure. On the "windows", I have to, uh, see if [unintelligible] give me twenty bags, so I can get at least twenty of them.

 d. WILLIAMS: That's what I'm trying to tell you.

 e. CORTEZ: But, but, but, yeah, I got you…

 f. WILLIAMS: Yeah, but y'all don't know what's-his-name ain't get it out.

 g. CORTEZ: I got you for sure.

 h. WILLIAMS: But…

 i. CORTEZ: I got you on that for sure.

 j. WILLIAMS: When, man? Cause [unintelligible] now, bro. Don't do me like that, brother, for real.

 k. CORTEZ: I, I got you. Give me like two hours. I got you on the "shoes" in less than an hour, bro, for sure.

 l. WILLIAMS: Alright, 'cause I'ma hit you back, man. I'ma be… Alright, say no more.

 m. CORTEZ: I got… I got you, bro.

  i. Based on my training and experience, and my knowledge of the investigation to date, I believe the above conversation to be indicative of WILLIAMS negotiating the procurement of an

unknown amount of cocaine ("shoes") and twenty kilograms of methamphetamine ("windows") from the CORTEZ DTO. CORTEZ reassured WILLIAMS that he can have the cocaine ("shoes") ready for WILLIAMS in less than an hour, but the methamphetamine ("windows") would take more time to procure. Due to this call taking place on the July 4th holiday and given the one-hour window to establish surveillance of the alleged cocaine transaction, agents were unable to determine if the above-mentioned cocaine ("shoes") transaction ever took place. However, described in more detail below, I believe the twenty (20) kilogram methamphetamine ("windows") transaction did take place on July 8, 2024 with the assistance of CORTEZ's wife CHAVEZ.

14. On July 8, 2024, at approximately 3:20 P.M., while monitoring an electronic surveillance platform affixed with a view of CORTEZ's home residence (5225 Gladden Rd, Fairburn, Georgia), agents observed an orange Honda Fit bearing Georgia license plate "SFY1333" (registered to Lucia Home Cleaning LLC of 3510 Dunn St SE, Smyrna, GA) pass in front of CORTEZ residence several times before ultimately parking on the roadway in front of CORTEZ residence. Once parked, CORTEZ's wife, Yeimy CHAVEZ, exited the residence and approached the Honda Fit. The front passenger exited the Honda Fit, opened the trunk of the vehicle, and removed a large cardboard box. CHAVEZ took possession of the box, which appeared to be heavy, and brought the box inside CORTEZ residence.

7

15. Approximately one hour later, while monitoring the same electronic surveillance platform affixed with a view of CORTEZ's home residence, agents observed a Toyota Camry bearing Georgia license plate "CVY2824" (registered to Ibrahima Diop of 4927 Wewatta St SW, Atlanta, GA) park on the roadway in front of CORTEZ's residence. Once parked, agents observed WILLIAMS exit the rear passenger door of the Toyota Camry and walk to the front door of CORTEZ's residence. A few seconds later, agents observed WILLIAMS walking back to the Toyota Camry with the same heavy box CHAVEZ was previously observed receiving from the orange Honda Fit and bringing into the CORTEZ residence. WILLIAMS placed the box into the trunk of the Toyota Camry, returned to the back-passenger seat, and the vehicle drove away shortly after.

16. Based on my training and experience, the previously mentioned wire intercept regarding WILLIAMS procurement of methamphetamine from the CORTEZ DTO, and my knowledge of the investigation to date, I believe the box dropped off by the Honda Fit, which was retrieved by WILLIAMS shortly after, contained the twenty kilograms of methamphetamine the CORTEZ DTO agreed to provide to WILLIAMS in the call above.

**B. July 11 and 12, 2024 Narcotics Transaction**

17. On July 11, 2024, agents intercepted wire and electronic communications between CORTEZ and MONTOYA that indicated that the CORTEZ DTO would be conducting a 40-kilogram cocaine transaction the following morning, with the narcotics destined for DARITY at 155 Birchmore Dr., Atlanta, Georgia, a townhome that he is believed to own or control (the "townhome").

18. On July 12, 2024, at approximately 6:14 A.M., a 2015 white Ford Transit van (the "Transit van") was captured by a license plate reader near 656 Warwick Drive, McDonough, Georgia (the "Warwick Drive house").

19. Then, at approximately 6:50 A.M., agents observed the Transit van arrive at CORTEZ's residence. Based on my training and experience and knowledge of the area, I believe that this indicates that the Transit van traveled directly from the Warwick Drive house to CORTEZ's residence.

20. The Transit van has been observed on numerous occasions at CORTEZ's residence; typically, the driver of the Transit van has received from CORTEZ what appears to be a duffel bag, which the driver of then places into the rear compartment of the Transit van before leaving. Agents therefore believe the Transit van to contain a hidden compartment used for the safe transport of narcotics and narcotics proceeds to and from CORTEZ's residence, the Warwick Drive house, and elsewhere.

21. Throughout the investigation, agents have observed the Transit van come and go from the Warwick Drive house and enter and exit a closed garage at the location. License plate reader analysis also shows that the Transit van is typically in the area around the Warwick Drive house in the early morning and late night hours.

22. On the morning of July 12, 2024, after the Transit van parked in front of CORTEZ's residence, agents observed the driver of the van exit the driver's seat of the vehicle and enter the rear compartment of the van, closing the door behind him. He remained inside the van for several minutes before exiting the van with a large box, which he took inside CORTEZ's residence. Immediately thereafter, he retrieved a second large box, which he

also took inside CORTEZ's residence. Shortly thereafter, at approximately 7:00 A.M., the driver entered the Transit van and then left the area.

23. License plate reader data indicates that the Transit van then returned to the Warwick Drive house at approximately 7:32 A.M.

24. Agents executed a court-authorized search warrant at the Warwick Drive house on the evening of July 17, 2024. There, they located approximately $500,000 in bundled cash in shoeboxes. Based on my training and experience and knowledge of the investigation, this cash is consistent with proceeds of drug trafficking.

25. At approximately 7:08 A.M. on July 12, 2024, following the Transit van's departure, Juan IBARRA, identified by the investigation as a courier for the CORTEZ DTO, arrived at CORTEZ's residence and went inside emptyhanded.

26. At approximately 7:10 A.M., IBARRA was then observed exiting CORTEZ's residence with a large, heavy, plastic bin and a large, heavy black duffel bag. IBARRA placed both of these containers in the back of his truck.

27. Based on my training and experience and knowledge of the investigation (including intercepted communications), I believe that CORTEZ received 40 kilograms of cocaine from the Transit van and then repackaged into the containers taken by IBARRA.

28. Shortly thereafter, and without removing the containers from IBARRA's truck, IBARRA and CORTEZ left CORTEZ's residence in separate vehicles but traveled in tandem. Intercepted communications between CORTEZ and MONTOYA showed MONTOYA provide CORTEZ with the address for the townhome as the location for delivery of the narcotics.

29. CORTEZ and IBARRA traveled to a BP gas station directly across the street from the townhome. There, CORTEZ parked his vehicle and got into IBARRA's vehicle (which still contained the suspected narcotics visible in the bed of the truck).

30. CORTEZ and IBARRA then traveled to the townhome. DARITY then opened the garage door at the location and CORTEZ and IBARRA parked inside.

31. The three men remained inside the garage for a short period of time. CORTEZ and IBARRA then left the townhome and returned to the BP gas station. Agents were able to observe that the suspected narcotics were no longer in the bed of IBARRA's truck.

### C. July 14, 2024, Money Laundering Transaction

32. On July 14, 2024, intercepted communications indicated that DARITY would be returning his profits from the sale of the narcotics supplied to him on July 12 to the CORTEZ DTO.

33. At approximately 8:30 P.M., agents observed DARITY leave his residence at 6552 Long Acres Drive, Atlanta, Georgia carrying a red bag.

34. Based on court-authorized vehicle tracker data, DARITY then traveled to the townhome where he stayed for a short period of time. DARITY then traveled to the area of 2809 Peachtree Road, Atlanta, Georgia, where CORTEZ was waiting.

35. The two traveled in tandem to the end of the road, where an unidentified occupant of CORTEZ's vehicle was observed exiting the vehicle, retrieving the red bag from DARITY's trunk, and then returning to CORTEZ's vehicle.

36. CORTEZ then traveled directly back to his residence.

37. During the trip back, agents intercepted communications between CORTEZ and MONTOYA indicating that the two would meet at 120 Couch Ct., Fayetteville, Georgia ("Couch Court"), another house owned by CORTEZ, to count the money retrieved from DARITY.

38. At approximately 10:30 P.M., CORTEZ and MONTOYA met at Couch Court, where agents observed an unidentified occupant of CORTEZ's vehicle bring what appeared to be the bag retrieved from DARITY into the location.

39. Based on my training and experience and knowledge of the investigation, during the incident described above, I believe that CORTEZ and MONTOYA coordinated the retrieval of drug proceeds from DARITY.

**D. July 17, 2024 Warrant Executions**

40. On July 17, 2024, this Court authorized a search of CORTEZ's residence a for evidence related to, among other things, narcotics trafficking conducted by the CORTEZ DTO (1:24-mc-1393).

41. Prior to executing the search warrant, at approximately 6:30 P.M., agents observed CORTEZ and his wife Yeimy CHAVEZ exit the CORTEZ residence and leave together in a vehicle.

42. Shortly thereafter, Georgia State Patrol conducted a traffic stop of that vehicle and detained CORTEZ and CHAVEZ pending the execution of the search warrant at the CORTEZ residence.

43. Subsequent to CORTEZ and CHAVEZ's detention, agents observed RAMIREZ

12

exit his residence at 5205 Gladden Road, Fairburn, Georgia with what appeared to be an empty backpack, walk to the CORTEZ residence, enter the residence, stay inside for a short period of time, then exit the CORTEZ residence with a full backpack and what originally appeared to be a large bag but was later determined to be a small fireproof safe.

44. RAMIREZ then returned to his residence with the bookbag and safe, stayed inside for a brief period of time, then exited again and placed the backpack and large bag into his vehicle, which was parked in the driveway.

45. A short time later, RAMIREZ was observed removing those bags from his vehicle and bringing them to the back yard of his residence.

46. Agents later executed a court-authorized search warrant at RAMIREZ's residence and located the backpack and safe in the crawlspace of the home, which had been bolted shut. Contained in the backpack and safe was over $100,000 in in banded cash, which, based on my training and experience, I believe to be proceeds from narcotics trafficking.

47. Agents also located in the house approximately five firearms and amounts of substances believed to be fentanyl, cocaine, and methamphetamine.

48. Based on the foregoing information, I respectfully submit that probable cause exists to justify the issuance of criminal complaints against

    a. Francisco Ivan CORTEZ-Camargo;

    b. Yeimy CHAVEZ;

    c. Edgar RAMIREZ;

    d. Richard DARITY;

    e. Luis Miguel MONTOYA Villagomez; and,

  f. Quincy WILLIAMS,

for violations of Title 21 United States Code, Section 846.

**End of Affidavit**